## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

In re:

·JUDITH ANNE CRAWFORD,

      Debtor.

Case No. 08 CIV. 6617
Hon. Stephen C. Robinson

## BRIEF OF APPELLANT HSBC BANK USA,
## AS TRUSTEE FOR THE REGISTERED HOLDERS OF ACE SECURITIES CORP.,
## HOME EQUITY LOAN TRUST SERIES 2004-IN 1, ASSET-BACKED PASS-THROUGH
## CERTIFICATES

# TABLE OF CONTENTS

Page

STATEMENT OF APPELLATE JURISDICTION .............................................................. 1

ISSUES PRESENTED ...................................................................................................... 1

STANDARD OF REVIEW .............................................................................................. 1

STATEMENT OF THE CASE ......................................................................................... 2

      A.     Introduction ....................................................................................... 2

      B.     Procedural and Factual Background ................................................. 3

ARGUMENT ................................................................................................................... 7

I.     THE BANKRUPTCY COURT ERRONEOUSLY CONCLUDED THAT HSBC VIOLATED SECTION 362 OF THE BANKRUPTCY CODE BY SUBMITTING A BID THAT NEVER RESULTED IN A SALE OR A TRANSFER OF TITLE OR POSSESSION OF DEBTOR'S PROPERTY. .................................................................. 10

II.    THE SUPPOSED AUTOMATIC STAY VIOLATION WAS NOT WILLFUL. ................ 12

III.   THE BANKRUPTCY COURT ERRED IN AWARDING PUNITIVE DAMAGES. ......... 17

IV.   THE AMOUNT OF THE PUNITIVE DAMAGES AWARD VIOLATES DUE PROCESS. .......................................................................................................... 22

CONCLUSION ................................................................................................................ 25

# TABLE OF AUTHORITIES

Page

## Cases

*Bank of Am., N.A. v. Adomah (In re Adomah)*,
   368 B.R. 134 (S.D.N.Y. 2007) ................................................................................. 1, 18, 20

*BMW of N. Am., Inc. v. Gore*,
   517 U.S. 559 (1996) ............................................................................................... 22, 24, 25

*Calvin v. Wells Fargo Bank, N.A.*,
   329 B.R. 589 (Bankr. S.D. Tex. 2005) ......................................................................... 21

*Capital Realty Servs., L.L.C. v. Benson (In re Benson)*,
   293 B.R. 234 (Bankr. D. Ariz. 2003) ........................................................................... 12

*Citizens Bank v. Strumpf*,
   516 U.S. 16 (1995) ....................................................................................................... 12, 13

*Crysen/Monetenay Energy Co. v. Esselen Assoc. Inc., (In re Crysen/Montenay Energy Co.)*,
   902 F.2d 1098 (2d Cir. 1990) ................................................................................. 10, 13, 18

*Dailey v. Chase Bank USA, N.A.*,
   No. 07-81073, 2007 Bankr. LEXIS 4323, (Bankr. C.D. Ill. Dec. 18, 2007) ................... 21

*Davis v. Matt Gay Chevrolet, Inc.*,
   374 B.R. 366 (Bankr. S.D. Ga. 2007) ........................................................................... 25

*Dawson v. Washington Mutual Bank*,
   346 B.R. 503 (Bankr. N.D Cal. July 27, 2006) ............................................................. 20

*Exxon Shipping Co. v. Baker*,
   128 S.Ct. 2605 (2008) ................................................................................................... 24

*Green Tree Servicing, LLC v. Taylor*,
   360 B.R. 282 (S.D. W. Va. 2007) ................................................................................. 19

*In re Campos*,
   2006 Bankr. LEXIS 2166 (Bankr. N.D. Cal. Sept. 1, 2006) ......................................... 25

*In re Gagliardi*,
   290 B.R. 808 (Bankr. D. Colo. 2003) ........................................................................... 17

*In re Hartley*,
   75 B.R. 394 (S.D. Ala. 1987) ....................................................................................... 25

*In re Hodge*,
   367 B.R. 843 (Bankr. M.D. Ala. 2007) ......................................................................... 25

*In re Kaufman*,
   315 B.R. 858 (Bankr. N.D. Cal. 2004) ......................................................................... 24

*In re Lile*,
   103 B.R. 830 (Bankr. S.D. Tex. 1989) ......................................................................... 17

*In re Lukach*,
   No. 805-89014-478, 2007 Bankr. LEXIS 1631 (Bankr. E.D.N.Y. May 8, 2007) ..................... 16, 25

*In re Manville Forest Prods. Corp.*,
   209 F.3d 125 (2d Cir. 2000)................................................................................................ 1

*In re Pole*,
   No. 07-62628, 2008 Bankr.
   LEXIS 1800 (Bankr. N.D.N.Y. June 12, 2008).......................................................... 19, 20

*In re Price*,
   103 B.R. 989 (Bankr. N.D. Ill. 1989),
   *aff'd* 130 B.R. 259 (N.D. Ill. 1991) ...................................................................... 17

*In re Quinenes Ocasio*,
   272 B.R. 815 (B.A.P. 1st Cir. 2002)..............................................................24, 25

*In re Santa Rosa Truck Stop, Inc.*,
   74 B.R. 641 (Bankr. N.D. Fla. 1987) ............................................................... 17

*In re Taylor*,
   No. 96-31737, 1997 Bankr.
   LEXIS 1322 (Bankr. E.D. Cal. June 25, 1997) ............................................... 24

*Kenton Cty. Bondholders Comm. v. Delta Air Lines, Inc. (In re Delta Air Lines)*,
   374 B.R. 516 (S.D.N.Y. 2007) .............................................................................. 1

*Maritime Asbestosis Legal Clinic v. LTV Steel Co. (In re Chateaugay Corp.)*,
   920 F.2d 183 (2d Cir. 1990).................................................................................. 22

*Salem v. Paroli*,
   260 B.R. 246256 (S.D.N.Y. 2001) ..............................................................10, 15, 16, 21

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
   538 U.S. 408 (2003). ............................................................................................ 23


**Statutes**

11 U.S.C. § 342(g)(1) ................................................................................................ 14
11 U.S.C. § 342(g)(2) ................................................................................................ 14
11 U.S.C. § 362 ............................................................................................................ 1
11 U.S.C. § 362(a)(3)............................................................................................10, 11, 12
11 U.S.C. § 362(a)(6)................................................................................................ 12
11 U.S.C. § 362(k) ..................................................................................................... 18
28 U.S.C. § 158(a) ...................................................................................................... 1

**Other Authorities**

*OTS Examination Handbook: Other Activities: Servicing* 750, http://files.ots.treas.gov//422341.pdf
(visited Aug. 21, 2008) ........................................................................................................................ 18

**Rules**

Fed. R. Bankr. P. 8013 ........................................................................................................................... 1

## STATEMENT OF APPELLATE JURISDICTION

The Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 158(a).

## ISSUES PRESENTED

1.   Did the Bankruptcy Court err in determining that HSBC violated the automatic stay
     provision of Section 362 of the Bankruptcy Code?

2.   Did the Bankruptcy Court err in determining that HSBC "willfully" violated Section 362 of
     the Bankruptcy Code by placing a bid on Debtor's property at previously scheduled
     foreclosure sale?

3.   Did the Bankruptcy Court err in imposing a punitive damages without any finding of malice
     or bad faith?

4.   Did the Bankruptcy Court err in imposing a punitive damages award with a 1,000-to-1 ratio
     to compensatory damages for, at most, a technical violation of the automatic stay?

## STANDARD OF REVIEW

In reviewing the decision of a bankruptcy court, a district court applies a clearly erroneous
standard to findings of fact and reviews conclusions of law *de novo. In re Manville Forest Prods.
Corp.*, 209 F.3d 125, 128 (2d Cir. 2000); Fed. R. Bankr. P. 8013. The decision whether a creditor
violated the automatic stay provisions of 11 U.S.C. § 362 is a matter of law. *Id.; see also Kenton Cty.
Bondholders Comm. v. Delta Air Lines, Inc. (In re Delta Air Lines)*, 374 B.R. 516, 522 (S.D.N.Y.
2007). Sanctions awards are reviewed under an abuse of discretion standard. *Bank of Am., N.A. v.
Adomah (In re Adomah)*, 368 B.R. 134, 137 (S.D.N.Y. 2007).

## STATEMENT OF THE CASE

#### A.    Introduction

Judith Anne Crawford (the "Debtor") filed her third bankruptcy petition in three years on the eve of a previously scheduled proceeding to foreclose on property that she had pledged as security for a mortgage loan owned by HSBC Bank USA, as Trustee for the registered holders of ACE Securities Corp., Home Equity Loan Trust Series 2004-IN 1, Asset-Backed Pass-Through Certificates ("HSBC").  Neither HSBC nor its agents had any knowledge of the petition until the scheduled foreclosure sale (nor any formal notice until two days later), at which time the state-appointed foreclosure referee explained to HSBC's bidding agent that a bankruptcy petition appeared to have been filed.  The referee further explained that he nevertheless intended to conduct the auction but that, if the petition turned out to be legitimate, the sale would be void, "like it had never happened."  HSBC placed the highest (and only) bid on the property, but title never changed hands and the referee never executed any sale agreement in connection with the transaction.  After receiving actual notice of the petition, HSBC and its agents immediately halted all foreclosure-related activity on the property.

Despite these uncontroverted facts, the Bankruptcy Court concluded that HSBC "wilfully" violated the automatic stay merely by submitting a bid on Debtor's property and, on that basis alone, imposed an outsized punitive damages award of $60,000—nearly *1,000 times* the actual damages of $66.88.  That holding is not justified by the record in this case and is wholly inconsistent with Second Circuit law governing punitive damages.  At most, the conduct at issue here constitutes a technical and inadvertent violation of the automatic stay (although, as discussed below, the submission of a contingent bid probably does not even involve a technical violation of Section 362), and certainly does not amount to the type of "malicious" act required to justify sanctions in any form.

The Bankruptcy Court made no finding of malice or bad faith to justify its punitive damages

2

award, as is required in the Second Circuit. Nor could it. The record is clear that (a) neither HSBC

nor its agents received any notice of the petition prior to the scheduled foreclosure sale; (b) there was

obvious ambiguity as to the authenticity and legal status of the petition as it was discovered at the

foreclosure sale; (c) no sale or transfer of title or possession of Debtor's property ever resulted from

the submission of HSBC's contingent bid; (d) within 48 hours of the submitting its bid, when it

confirmed the validity of the petition, HSBC and its agents immediately took active steps to halt all

foreclosure-related activity in connection with Debtor's property (in practical effect, a precautionary

measure as no sale ever occurred); and (e) Debtor suffered only *de minimis* damages in connection

with the schedule foreclosure sale.

In these circumstances, the punitive damages award cannot be sustained.

## B.    Procedural and Factual Background

On July 11, 2007, HSBC was awarded a Judgment of Foreclosure and Sale in connection

with a mortgage it held on a property located at 173 Andrews Road, LaGrangeville, New York

12450. The Judgment of Foreclosure was in favor of HSBC and against Debtor and her spouse,

Martin Crawford, the owners of the property. A foreclosure sale in respect of that judgment was

scheduled to be conducted on August 22, 2007. (Docket No. 21, Memorandum Decision ("Mem.")

at 7.) That sale was cancelled due to the filing of a bankruptcy petition by Martin Crawford on

August 20, 2007. (*Id.*) That petition was dismissed by order of Bankruptcy Judge Cecilia G. Morris,

dated October 17, 2007, due to Debtor's failure to comply with the Court's order that she make

specified installment payments. (*Id.*; *see also* No. 07-36263 (Bankr. S.D.N.Y..) Thereafter, a new

foreclosure sale was scheduled for November 27, 2007. (*Id.*) Frank M. Mora, Esq. ("Referee"), was

appointed as Referee to conduct the sale pursuant to the above-referenced judgment.

Debtor filed her present Chapter 13 bankruptcy petition with the United States Bankruptcy

Court for the Southern District of New York on November 26, 2007. (*Id.*) On the same day, the

3

court issued a Deficiency Notice noting that the petition failed to include, *inter alia*, a schedule of assets and liabilities, a schedule of current income and expenditures, a statement of financial affairs, or a statement of monthly net income. (Docket No.2.) On November 28, 2007, the court sent a notice of Chapter 13 Bankruptcy Case to Jeffrey L. Sapir, Chapter 13 Trustee; the United States Trustee; the Sheriff of Dutchess County; and Ocwen Loan Servicing, LLC ("Ocwen") (incorrectly identified as Ocwen Federal Bank FSB), as loan servicer for HSBC. (Docket No. 3.)

On the day of the filing, Debtor's spouse faxed a copy of the petition to the Referee. (Mem. at 4.) Neither HSBC, Ocwen (as servicer for HSBC), or their attorneys, Shapiro & DiCaro, LLP, were notified of the petition on the day it was filed. Although he claimed he intended to send a copy of the petition via facsimile to Shapiro & DiCaro, Mr. Crawford admits that he directed the fax to an incorrect number. (Mem. at 29.) Because of this error, Shapiro & DiCaro did not learn of the Debtor's Chapter 13 bankruptcy filing until November 29, 2007. (*Id*. at 4.)

The Referee testified that Mr. Crawford appeared at the scheduled foreclosure sale on November 27, 2008, and presented him with a copy of the petition. (*Id*. at 6.) At the time, the Referee was unsure as to the validity and the legal effect of the bankruptcy petition (which, as noted above, had already been deemed deficient by the Bankruptcy Court). (*Id*. at 13, 19-20.) Among other things, the Referee believed the petition may have been the Debtor's second bankruptcy petition and thus he was unsure as to what effect, if any, the petition might have on the planned foreclosure sale. (*Id*. at 32.)

Given the ambiguity concerning the authenticity and legal status of the petition, the Referee explained to Mr. Crawford that "I don't know if I'm supposed to go forward, if I'm supposed to stop. So I'm going forward. However, if this is an accurate and true filing and it is stayed, it's going to be null and void. ***It's going to be like this never even happened.***" (*Id*. at 13) (emphasis added). The

4

Referee testified that he repeated that explanation to the attendees at the foreclosure sale prior to soliciting bids: "I'm not sure if this is -- is going to be a good sale, so from this moment -- you know, when we do the sale, if it [the Petition] [is] a valid one, it's going to be null and void as if it never happened." (*Id.* at 13.) Referee then asked if there were any bids on the property. (*Id.*) HSBC's representative, Thomas Didonato, submitted a bid of $316, 916.74. (*Id.*) As the only bidder at the auction, Didonato's was the highest bid submitted for Debtor's property. (*Id.*) Rather than follow his usual practice of remitting a signed copy of the terms of sale to the purchaser to complete the sale, the Referee elected instead to keep the terms of sale in his possession in case the auction was "not valid." (*Id.* at 14.) Indeed, the Referee never signed the terms of sale, memorandum of sale, or deed, and when he realized that an automatic stay was in place as a result of the petition, he "immediately contacted the Debtor and Mr. Crawford to inform that that the sale was invalid and no deed would be signed." (*Id.* at 14.)

Two days later, on November 29, 2007, Shapiro & DiCaro and Ocwen received confirmation that Debtor had filed a valid Chapter 13 petition. (*Id.* at 4.) They immediately halted all foreclosure- and marketing-related activity in relation to Debtor's property. (*Id.*) As noted above, title and possession to Debtor's property never changed hands.

On January 9, 2008, Martin Crawford sent a letter to the U.S. Bankruptcy Court for the Southern District of New York indicating that he wished to withdraw the petition because he believed the property located at 173 Andrews Road, LaGrangeville, New York had been sold at auction. (*Id.* at 3; Docket No. 12] Thereafter, the Bankruptcy Court issued a order directing HSBC and the Referee to show cause as to why they should not be held liable for willfully violating the automatic stay. (Mem. at 3; Docket No. 13.) Shapiro & DiCaro filed an attorney affirmation in response to the order, stating that the facsimile containing a copy of the petition had not reached their

offices prior to the foreclosure sale because it had been sent to the incorrect fax number. (Mem. at 4.) That affirmation further stated that: "Our records reflect that we did not learn of the Debtor's Chapter 3 bankruptcy filing [until] November 29, 2007 which was two days after the sale. We immediately advised our client that the sale was invalid and put our foreclosure file on hold due to the pending bankruptcy filing." (*Id.* at 4; Docket No. 14)

On February 5, 2008, the Bankruptcy Court held an evidentiary hearing on the show cause order. (*Id.* at 4.) Mr. Crawford, the Referee, and an attorney from the Shapiro & DiCaro law firm presented testimony. On April 28, 2008, the court held a second evidentiary hearing in which the court heard testimony from Mr. Crawford, the Referee, an Ocwen corporate representative named Jessica Dybas, and Mr. Didonato.

On June 5, 2008, the Bankruptcy Court issued a Memorandum Decision on Order Directing Secured Creditor And Foreclosure Referee To Appear And Show Cause Why They Should Not Be Liable For Violation of the Automatic Stay And Why Post-Petition Foreclosure Sale Should Not Be Vacated. (Docket No. 21.) The court held, *inter alia*, that the "foreclosure sale" (*i.e.*, the process by which the Referee solicited contingent bids on Debtor's property) violated the automatic stay and that the sale was, therefore, void *ab initio*, regardless of whether the stay violation was willful. (Mem. at 15.) The court further found that the Referee had notified Mr. Didonato at the foreclosure sale that a bankruptcy petition had been filed and thus concluded that the bid he submitted to the Referee constituted a willful violation of the automatic stay, even though the submission of that bid did not result in a signed deed, a transfer of title, or a transfer of possession. (*Id.* at 20.) The court imputed both Mr. Didonato's knowledge of the putative petition and his supposedly willful violation of the stay to HSBC by virtue of its agency relationship with Didonato. (*Id.* at 19.)

Based on its conclusion that Didonato willfully violated the stay, the court awarded the

6

Debtor actual damages of $66.88 in connection with out-of-pocket expenses in the course of attending and participating in the February 5 and April 27 hearings on the order to show cause. (*Id.* at 25.) The court also struck a total of $8,553.34 in undated fees from HSBC's proof of claim without prejudice to HSBC's right to file an amended proof of claim indicating the date and purpose of the charges. (*Id.* at 26.)

Finally, the court concluded that an additional punitive damages award was appropriate because "Mr. Didonato's bid at the foreclosure sale was an intentional and deliberate violation of the stay." (*Id.* at 28.) The court also cited HSBC's "institutional indifference" as grounds for imposing punitive damages, and observed that HSBC should have "conducted an on-line search on the afternoon prior to the sale" to confirm whether the Debtor had filed for bankruptcy. (*Id.* at 29.) In setting the amount of the award, the court explained that "[t]he same and complexity of HSBC's system of agents, subagents and servicing agents is relevant to the amount of sanctions." (*Id.* at 32.) The amount of the punitive award, $60,000, "amount[s] to $10,000 per layer, including principal, servicing agent, and various agents and sub-agents." (*Id.* at 32.)

On June 19, 2008, the Court issued an order directing HSBC to remit the punitive damages award to the Debtor within 30 days. (Docket No. 23.) The Bankruptcy Court granted HSBC's request to post a supersedeas bond in satisfaction of the punitive award pending appeal. HSBC timely filed its notice of appeal of the punitive damages award on June 30, 2008. (Docket No. 25.) HSBC posted a bond in the amount of $66,674.24 on July 24, 2008. (Docket No. 35.)

## ARGUMENT

The Bankruptcy Court concluded that Appellant HSBC "willfully" violated the automatic stay provisions of Section 362(a) of the Bankruptcy Code, and imposed a punitive award against HSBC, despite finding that: (a) neither HSBC nor any related party received notice of Debtor's bankruptcy petition until HSBC's servicing agent appeared at the location for a previously scheduled

7

foreclosure sale (Mem. at 19) ("The Referee notified Mr. Didonato at the foreclosure sale that a bankruptcy petition had been filed"); (b) HSBC's servicing agent was instructed by the court-appointed foreclosure referee that proposed bids would be accepted contingent on the potential effect of the bankruptcy petition (*id.* at 13); (c) the referee assured HSBC's servicing agent that, if the bankruptcy petition was properly filed and served, "[i]t's going to be like this never even happened" (*id.*); and (d) no deed of sale was executed and no transfer of title or possession occurred with respect to Debtor's property. (*Id.* at 15.) The court did not -- and could not -- conclude that HSBC or its agents acted with malice or bad faith in submitting a contingent bid on Debtor's property. Nevertheless, the court awarded punitive damages of $60,000, nearly *1,000 times* the amount of the compensatory award of $66.88.

As the U.S. Supreme Court reaffirmed just this Term, basic principles of Constitutional due process simply do not permit the grossly disproportionate punitive award imposed here. The award should be set aside for that reason alone. But the decision below suffers from other fundamental errors as well. *First*, HSBC's submission of a bid at the invitation of the state-appointed foreclosure referee to purchase the property that secured its mortgage loan did not violate the automatic stay provisions of Section 362 of the Bankruptcy Code. HSBC's contingent bid never resulted in the sale or transfer of Debtor's property. And HSBC was not provided with a copy of Debtor's bankruptcy petition (which was, in any event, sufficiently deficient in form to cause the Chapter 13 Trustee to move to dismiss the bankruptcy proceeding (Docket No. 11)) until two days after the petition had been filed. Although the state-appointed referee announced, prior to soliciting bids, that he had received what appeared to be a copy of the petition, he made clear his intent to move forward with the auction with the "caveat" that the sale would be of no effect if the petition was legitimate. HSBC submitted a bid in that context not to "obtain possession of the property," but simply to preserve the

8

status quo if the petition turned out not to be valid. *Cf.* 9A Am. Jur. 2d Bankruptcy § 1369 (1991) ("Although the primary purpose of the automatic stay is to benefit the debtor or trustee, the stay also provides creditor protection . . . [by] allow[ing] the orderly resolution of all claims and the distribution of the debtor's assets in accordance with the priorities recognized by the Bankruptcy Code."). Because there was no "act to obtain possession of the property of the estate" within the meaning of Section 362(a) on the part of HSBC, there was no violation of the automatic stay.

*Second*, even if the contingent bid by the auction agent could be construed as a technical violation of the automatic stay, HSBC's conduct was certainly not "willful" within the meaning of Section 362(k) of the Bankruptcy Code. As discussed above, the placing of a contingent bid at the express direction of the state-appointed referee was, at most, an inadvertent violation of the stay and attributable principally to confusion regarding the legal validity of a petition filed at the eleventh hour, just before a previously scheduled foreclosure sale. Perhaps more important, that HSBC and its agents immediately took active steps to halt all foreclosure-related activity in connection with Debtor's property as soon as they received formal notice of the petition 48 hours after the auction. Any suggestion that HSBC acted "willfully" in seeking to obtain possession of Debtor's property in violation of the stay is flatly contradicted by its active efforts to honor the stay as soon as it confirmed the authenticity and legal effect of the petition.

*Third*, even if the record could be interpreted reasonably to support the conclusion that HSBC willfully violated the automatic stay, there is nothing in the record to justify the Bankruptcy Court's award of punitive damages. As the Bankruptcy Code itself makes clear, a "willful" violation of the automatic stay, without more, is not sufficient to support a punitive damages award. Instead, punitive damages are only justified in "appropriate circumstances," which the Second Circuit has held requires "an additional finding of maliciousness or bad faith." *Crysen/Monetenay Energy Co. v.*

*Esselen Assoc. Inc., (In re Crysen/Montenay Energy Co.)*, 902 F.2d 1098, 1105 (2d Cir. 1990). The court here did not (and could not) make any finding that HSBC's conduct in connection with its contingent bid on the property was "malicious" or in bad faith. Instead, it justified the punitive award as "necessary" in order to "get the attention of the principal creditor." (Mem. at 29.) That ruling not only ignores the applicable legal standard for awarding punitive damages in the Second Circuit, it is flatly contradicted by HSBC's obvious efforts to stop all foreclosure-related activity on Debtor's property as soon as it confirmed the validity of the petition.

I.    **THE BANKRUPTCY COURT ERRONEOUSLY CONCLUDED THAT HSBC VIOLATED SECTION 362 OF THE BANKRUPTCY CODE BY SUBMITTING A BID THAT NEVER RESULTED IN A SALE OR A TRANSFER OF TITLE OR POSSESSION OF DEBTOR'S PROPERTY.**

Section 362 of the Bankruptcy Code prohibits any "act to obtain possession of the property of the estate" after the filing of a bankruptcy petition. 11 U.S.C. § 362(a)(3). The automatic stay is "effective at the moment the petition is filed." *Salem v. Paroli*, 260 B.R. 246256 (S.D.N.Y. 2001). Here, the Bankruptcy Court concluded that the lodging of a contingent bid with a state-appointed referee at an auction that never resulted in a sale or transfer of title or possession of Debtor's property violated the automatic stay. (Mem. at 20.) That holding is untenable.

The Code makes clear that the automatic stay does not prohibit all post-petition conduct by a creditor with respect to the estate; rather, it only forbids "act[s] to obtain possession of the property of the estate." 11 U.S.C. § 362(a)(3). Here, there was no such act. The bids solicited by the Referee were expressly contingent upon the legal validity or invalidity of Debtor's petition. As the record makes clear, the authenticity of the petition and its effect on the foreclosure sale were unclear under the circumstances. The Referee had a good-faith belief that the petition may have been without legal

effect because it was the Debtor's second petition in a matter of months.[1]  (Mem. at 32.)  In light of that ambiguity, the Referee, who presided over the auction, announced that the bidding would go forward with the "caveat" that any bids on the property would be "null and void" if the Debtor's petition turned out to be valid.  (*Id.* at 15; *see also id.* at 13 ("I don't know if I'm supposed to go forward, if I'm supposed to stop.  So I'm going to go forward.  However, if this is an accurate and true filing and it is stayed, it's going to be null and void.").)  The Referee informed Didonato not to worry about submitting a bid, because if the bankruptcy petition turned out to be legitimate, "*[i]t's going to be like this never even happened.*"  (*Id.* at 13) (emphasis added)  By submitting a bid under those circumstances (and having not been provided with a copy of the petition), HSBC did nothing more than seek to preserve the status quo.  Critically, HSBC's bid did not result in a sale or transfer of title or possession of Debtor's property; it was simply an offer to pay *if* Debtor's petition turned out to be invalid.  In these circumstances, the conduct of HSBC and its agents cannot properly be viewed as an affirmative act "to obtain possession of the property of the estate."

In analogous cases, courts have looked to the *payment* of a bid price—not simply the announcement of a bid—as the act that changes the legal relationship between the debtor and creditor for purposes of the automatic stay.  As one court explained, "the payment of the bid price, unlike recordation of a trustee's deed, is not *merely a ministerial act that preserves the status quo* or only gives the world notice of what has occurred, but rather is an act of legal substance that changes the relationship of the parties and effectively removes property from property of the estate."  *Capital Realty Servs., L.L.C. v. Benson (In re Benson)*, 293 B.R. 234, 241 (Bankr. D. Ariz. 2003) (emphasis added).  Here, the bid was precisely that: "a ministerial act that preserve[d] the status quo."  The bid never resulted in a sale, or transfer of title or possession; Debtor was never evicted from her home;

---

[1]    Although the Bankruptcy Court stated that the Referee was "wrong" in his belief that the Debtor previously had filed a Chapter 13 petition, the decision itself makes clear that a previous petition was filed on August 20, 2007.  (Mem. at 32.)

the Referee treated the bid as a contingent offer to pay, and did not finalize any of the paperwork required to consummate a sale. In short, Debtor's property never left the property of the estate.

The United States Supreme Court itself has acknowledged the pragmatic limitations on the automatic stay provision in circumstances involving the type of contingent arrangements at issue here. In *Citizens Bank v. Strumpf*, for example, the Court held that a post-petition administrative hold on the debtor's bank account did not violate the stay. The Court explained:

> [A] bankruptcy filing automatically stays "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate," 11 U.S.C. § 362 (a)(3), and "any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title," § 362(a)(6). *Respondent's reliance on these provisions rests on the false premise that petitioner's administrative hold took something from respondent, or exercised dominion over property that belonged to respondent.* That view of things might be arguable if a bank account consisted of money belonging to the depositor and held by the bank. In fact, however, it consists of nothing more or less than a promise to pay, from the bank to the depositor; and petitioner's temporary refusal to pay was neither a taking of possession of respondent's property nor an exercising of control over it, but merely a refusal to perform its promise.

*Citizens Bank v. Strumpf*, 516 U.S. 16, 21 (1995) (emphasis added). The principle recognized in *Strumpf* is that something more than a ministerial act – something with an actual legal or practical effect on the estate or debtor – is required to constitute a violation of the automatic stay. Applied here, HSBC's contingent bid did not "[take] something from [the Debtor], or exercise[] dominion over property that belonged to [Debtor]." It merely represented an offer to pay that never resulted in an actual sale transaction or transfer of title or possession. The contingent bid thus cannot be deemed a violation of the automatic stay.

## II.     THE SUPPOSED AUTOMATIC STAY VIOLATION WAS NOT WILLFUL.

Even assuming *arguendo* that the submission of a bid on Debtor's property that was expressly conditioned on confirmation of the validity or invalidity of the bankruptcy petition could have constituted a technical violation of Section 362, neither HSBC nor its agents willfully violated

12

the stay. In the Second Circuit, a willful violation of the automatic stay is defined as "any deliberate act taken in violation of a stay, *which the violator knows to be in existence.*" *Crysen/Montenay Energy Co.*, 902 F.2d at 1105. Section 362(h) of the Bankruptcy Code permits the award of "damages upon a finding that the defendant knew of the automatic stay and that the defendant's actions which violated the stay were intentional." *Id.* Here, the court based its order against HSBC on a finding that HSBC's agent, Mr. Didonato, willfully violated the automatic stay by submitting a contingent bid at the auction after the Referee announced that he was handed what "appears to be a bankruptcy petition." (*Id.* at 13, 20.) That holding is wrong as a matter of law.

As an initial matter, although the Court reasoned that HSBC violated the automatic stay by submitting a bid after its agent "had actual knowledge of the Debtor's bankruptcy filing" (Mem. at 20), there is no basis for concluding that the purported notice—the Referee's oral statement at the auction—provided actual notice of the petition as required under the Bankruptcy Code. Section 342(g)(1) provides, in relevant part, that "[n]otice provided to a creditor by the debtor or the court other than in accordance with [section 342] shall not be effective notice until such notice is brought to the attention of such creditor." 11 U.S.C. § 342(g)(1). That same provision makes clear that a "monetary penalty may not be imposed on a creditor for a violation of a stay in effect under section 362(a) . . . unless the conduct that is the basis of such violation or of such failure occurs after such creditor receives notice effective under this section of the order for relief." *Id.* § 342(g)(2). The court should not have deemed this valid notice given that the Referee's statements at the foreclosure sale—which, needless to stay, were cryptic at best (Mem. at 14) ("I have this filing. I don't know if it's valid. I'm not going to do like I normally do[.]") and displayed his "confusion about the legal effect of the bankruptcy filing" (*id.* at 32)—did not rise to the level of "notice" required by statute.

Perhaps more important, the Referee openly acknowledged at the auction that he did not

13

know whether the petition was valid or what legal effect it would have on a sale of Debtor's property. (Mem. at 13.) It was not unreasonable for the Referee to question the authenticity and legal effect of the petition. As a practical matter, the petition was deficient: the Bankruptcy Court itself distributed a notice of deficiency on the day the petition was filed (Docket No. 2), and the Chapter 13 Trustee later moved to dismiss the case based on the Debtor's subsequent failure to cure those deficiencies. (Docket No. 13.) Although the Bankruptcy Court concluded that the Referee was "wrong" in believing that the Debtor had previously filed a Chapter 13 petition (Mem. at 32), the Order makes clear that Debtor had indeed previously filed a petition on August 20, 2007.[2] (Id. at 7.) Under Section 362(c)(3), if the debtor has had one prior case dismissed within the preceding one-year period, the stay automatically expires after 30 days unless the court affirmatively continues the stay. As such, the Referee could reasonably believe that any stay applicable to the prior-filed petition had long since expired.

The Referee further declared that he would solicit bids for the property with the caveat that any purported "sale" would be null and void if the petition was valid. (Mem. at 13.) Acting at the express invitation of the referee, HSBC's agent, Mr. Didonato followed his instructions and submitted a proposed bid. The uncertainty (perpetuated in the first instance by the Referee, the only participant at the auction who received actual notice of the petition) regarding the validity of the petition and its legal effect on the bidding process cannot reasonably support the conclusion that HSBC or its agents "wilfully" violated the stay.[3] At most, the solicitation and registering of bids by

[2]    As to this testimony, the Bankruptcy Court concluded "The Referee is wrong on both counts." (Mem. at 32.) In fact, the Bankruptcy Court, and not the Referee, is wrong. As the Memorandum Decision makes clear, the November 27, 2008 bankruptcy filing at issue here is the Debtor's third bankruptcy filing in three years. (See id. at 7 (noting previous petition at No. 07-36263 (Bankr. S.D.N.Y.); see also No. 05-37590 (Bankr. S.D.N.Y.).) The Referee's confusion as to the legal status of this third filing on the heels of the Debtor's August 2007 petition only underscores the reasonable ambiguity the participants faced at the scheduled foreclosure sale.
[3]    The fact that the Bankruptcy Court chose not to credit Didonato's testimony that he did not recall a conversation with Mr. Crawford at the foreclosure sale is immaterial. (Mem. at 19.) The testimony provided by the Referee, and credited by the court, makes clear that the validity and legal status of the petition was, at best,

14

the Referee was attributable to a mistake of law (*see id.* at 32 (noting Referee's "confusion about the legal effect of the bankruptcy filing"); *id.* (noting the Referee testified that "he believed that this bankruptcy filing, the Debtor's first, was Mr. Crawford's second bankruptcy filing, and that a second filing would not operate as stay of the foreclosure sale")), which courts have refused to acknowledge as a basis for finding a "willful" violation of the automatic stay. In *Salem v. Paroli*, for example, this Court concluded that post-petition proceedings against a debtor's property authorized by a state court judge did not constitute a "willful" violation of the stay. 260 B.R. 246 (S.D.N.Y. 2001). The judge had refused to stay the proceeding in light of the petition on grounds that the debtor had not provided "any affidavit or other evidence that the bankruptcy court has issued a stay." *Id.* at 256. This Court concluded that the judge's "patent misreading of bankruptcy law" tended to show that the action in disregard of the stay was not "willful," but rather was based on a mistake of law. *Id.* at 257. The bankruptcy court's conclusion that a contingent bid at an auction of uncertain legal effect constituted a willful violation of the stay cannot be squared with this Court's decision in *Salem*.

Any ambiguity regarding HSBC's "knowledge" and its intent to violate the stay is resolved by the immediate actions that HSBC and its agents took to halt all foreclosure-related activity in connection with Debtor's property within 48 hours after the auction when they confirmed the validity and legal effect of the petition. (*See, e.g.*, Mem. at 4 (stating that upon learning of the Debtor's Chapter 13 filing, Shapiro & DiCaro "immediately advised our client that the sale was invalid and put our foreclosure file on hold due to the pending bankruptcy filing"); *id.* at 8 (as soon as Ocwen was informed of the bankruptcy filing, "it stopped all the after-foreclosure processes and

---

ambiguous at the time of the auction. (*Id.* at 19, 20.) Of course, the entire dispute could have been avoided if the Referee -- the only participant at the auction who received an actual copy of the (albeit deficient) petition prior to the scheduled auction -- had halted the sale to inquire as to the legal effect of the petition. Instead, he announced that he would press ahead and accept bids, and chose to address the legal ambiguity by holding up the completion of the sales process until after the authenticity of the petition had been confirmed. In light of the Referee's clear intention to accept bids, and the ambiguity of the petition, the only reasonable course of action for HSBC's auction bidder was to submit a bid to preserve the status quo and to protect HSBC's security interest in the property.

immediately opened up a bankruptcy module.).) Courts have consistently held that his type of effort to immediately remedy a technical violation of the stay demonstrates that the violation was not willful. *See, e.g., Salem*, 260 B.R. at 257 (finding no willful violation of the stay where creditors "took active steps to stop the state [court] proceedings once they received formal notice of plaintiff's bankruptcy petition" and title to debtor's property never transferred); *cf. In re Lukach*, No. 805-89014-478, 2007 Bankr. LEXIS 1631 (Bankr. E.D.N.Y. May 8, 2007) (failure to discontinue collection efforts in light of the automatic stay constitutes a "willful" violation).

The immediate and uncontroverted efforts by HSBC and its agents to halt all foreclosure-related activities related to Debtor's property immediately after determining the existence of a valid petition contrast sharply with the cases the Bankruptcy Court relied on to justify its holding. None of those cases involved efforts by the creditor or its agents to halt all efforts to obtain possession of debtor's property immediately after confirming the validity of the petition. *See, e.g., In re Santa Rosa Truck Stop, Inc.*, 74 B.R. 641, 643 (Bankr. N.D. Fla. 1987) (finding willful violation where the IRS filed three tax liens against debtor's property within two months after receiving the petition and Order Continuing Debtor-in-Possession from the court); *In re Lile*, 103 B.R. 830 (Bankr. S.D. Tex. 1989) (the IRS waited 11 months after receiving notice of the petition to return seized property); *In re Price*, 103 B.R. 989, 993 (Bankr. N.D. Ill. 1989), *aff'd* 130 B.R. 259 (N.D. Ill. 1991) (notice of intention to levy served on debtor four months after IRS received notice of petition constituted willful violation of automatic stay); *In re Gagliardi*, 290 B.R. 808, 813 (Bankr. D. Colo. 2003) (eviction of debtor from his house after, *inter alia*, Court mailed notice of the petition to the creditor, the creditor's outside bankruptcy service identified the petition in the debtor's electronic loan file, and creditor was informed of the petition during the eviction action constituted a willful violation).

In short, even if the contingent bid constituted a technical violation of the stay, it was not

16

willful and, thus, any award of damages pursuant to 11 U.S.C. § 362(k) is improper.

**III.    THE BANKRUPTCY COURT ERRED IN AWARDING PUNITIVE DAMAGES.**

As noted above, HSBC neither willfully violated the automatic stay nor caused any actual damage to the Debtor. But even if it had done both, that would not permit punitive damages to be imposed here. Section 362(k)(1) of the Bankruptcy Code provides that: "[a]n individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, *in appropriate circumstances*, may recover punitive damages." 11 U.S.C. § 362(k) (emphasis added). As the Code itself makes clear, a "willful" violation of the automatic stay alone is not enough to warrant punitive damages; there must also be a finding of "appropriate circumstances." In the Second Circuit, this requires "an additional finding of maliciousness or bad faith" to award anything more than actual damages. *Crysen/Montenay Energy Co.*, 902 F.2d at 1105. "[E]ven callous disregard is an insufficient basis upon which to award punitive damages because it does not rise to the level of bad faith or maliciousness." *Adomah*, 368 B.R. at 139.

The punitive damages award should be vacated here because the bankruptcy court did not (and could not) make any "additional finding" that HSBC or its agents acted with malice or bad faith in lodging a contingent bid on Debtor's property. Instead, the court justified the punitive damages award on grounds that it was "troubled by the fact that HSBC elected to respond to the Order to Show Cause . . . by sending a servicing agent [Ocwen]." (Mem. at 29.) The Bankruptcy Court reasoned that this "institutional indifference [] supports the Court's belief that punitive damages are necessary to get the attention of the principal creditor." (*Id.*)

As a practical matter, the bankruptcy court served the Order to Show cause on "HSBC Bank USA, NA/Ocwen Loan Servicing LLC" care of the Shapiro & DiCaro law firm. Attorneys from the Shapiro firm appeared at both show cause hearings. There was nothing in the order that required HSBC to send a personal representative to those hearing, as opposed to its attorney or its loan

17

servicer. (In fact, although the Shapiro firm appeared at both show cause hearings and HSBC's

servicer, Ocwen, appeared at the second show cause hearing, HSBC itself was not informed of either

the show cause order or hearings. It first learned of the order and show cause hearings after the court

issued its sanctions order. Thus, it did not knowingly or intentionally fail to personally appear at the

hearings.) If the underlying premise of the court's ruling is that the knowledge of HSBC's agents

can be imputed to HSBC for purposes of assessing liability, then surely the attendance of HSBC's

agents at the show cause hearing is sufficient to demonstrate HSBC's compliance with that order.

The fact that a substantial portion of the bankruptcy court's decision is dedicated to

explaining the law of agency underscores the fact that the punitive award is based principally on the

court's apparent frustration with institutional relationships that are commonplace in the mortgage

servicing industry.[4]  (*Id.* at 30 ("The fact that HSBC does not appear to be equipped to react to such

filings in a timely fashion supports an award of punitive damages in this case."); *id.* at 32 ("The size

and complexity of HSBC's system of agents, subagents and servicing agents is relevant to the

amount of sanctions that will be necessary as a deterrent to their conduct in the future.").) But

whatever the source, that frustration alone is not sufficient to sustain a punitive award. *See Green*

*Tree Servicing, LLC v. Taylor*, 360 B.R. 282, 299 (S.D. W. Va. 2007) (upholding denial of punitive

award where the creditor "ceased all collection efforts [after receiving notice of the petition],

suggesting that indifference and poor communication between Green Tree's counsel and the various

---

[4]      When a loan is secured by a mortgage, the borrower may be asked to sign various transfer agreements that allow the mortgagee to assign not only the mortgage itself but also various rights that the mortgage grants to the mortgagee, such as the rights to collect monthly payments, collect late payments, or foreclose in the event of default. The administration of these rights is called "servicing" the mortgage. If the firm doing the servicing (here, Ocwen) is alleged to have exceeded its rights under the transfer agreements, the mortgagor's (here, the Debtor) recourse is against *that* firm rather than against the original mortgagee or the current holder of the mortgage (here, HSBC). *See OTS Examination Handbook: Other Activities: Servicing* 750, http://files.ots.treas.gov//422341.pdf (last visited Aug. 21, 2008). The fact that Ocwen, as servicer for HSBC, appeared through its counsel at the Show Cause hearing focused on the conduct of a bidding agent retained in connection with a foreclosure on a loan it serviced is entirely consistent with this run-of-the-mill industry arrangement.

18

levels of the organization probably led to the stay violations, rather than the type of reckless

disregard, arrogant defiance, bad faith or malicious, egregious, or vindictive conduct generally

required for a punitive damages award."). As noted *supra*, this type of relationship between the

trustee and its loan servicer (and its agents) is commonplace in the mortgage industry. The fact that

the bankruptcy court did not make a single finding of malicious or bad-faith conduct by HSBC or its

agents in respect of the automatic stay is reason alone to reverse the punitive award.

      The Bankruptcy Court's decision to the contrary is far out of step with recent authorities.

Earlier this summer, Chief Judge Stephen D. Gerling of the U.S. Bankruptcy Court for the Northern

District of New York heard a request for punitive damages in a case involving far more intrusive

post-petition creditor conduct. *See In re Pole*, No. 07-62628, 2008 Bankr. LEXIS 1800 (Bankr.

N.D.N.Y. June 12, 2008). In that case, the creditor served an income execution on debtor's employer

five months after the filing of the petition, requiring the employer to withhold money from debtor's

wages. The income execution had been entered pursuant to a post-petition judgment against the

debtor brought by the creditor. Some five months later, the judgment continued to frustrate debtor's

finances as he was denied credit to purchase a motor vehicle in light of the judgment. The creditor

previously had been provided with a copy of the petition. In that case, the court held that the creditor

"chose to completely ignore the automatic stay statutory imposed upon the filing of [the petition] and

proceed, post-petition, with a motion for summary judgment . . . some two months post-petition." *Id.*

at *4-5. The court went on to explain that the debtor "should not be subject to the continuation of a

lawsuit based on a pre-petition debt by a large institutional creditor relying on some ill-conceived

notion that it is above the law." That reprimand notwithstanding, the court concluded that the

creditor's conduct did not rise to the level of "maliciousness or bad faith," and therefore declined to

award punitive damages. *Id.* at *6.

19

In analogous cases, courts have denied requests for punitive damages where the conduct at issue is attributable to a mistake of law. For example, the U.S. Bankruptcy Court for the Northern District of California recently concluded that a post-petition foreclosure sale by a mortgage originator did not warrant punitive damages where the legal effect of the petition was "ambiguous." *Dawson v. Washington Mutual Bank*, 346 B.R. 503 (Bankr. N.D Cal. July 27, 2006). The debtor in *Dawson* filed a Chapter 7 bankruptcy petition on February 6, and Washington Mutual Bank, the owner of a mortgage loan secured on debtor's property, conducted a previously scheduled foreclosure on February 8. At the time, the debtor claimed the foreclosure sale was void in light of the petition, but the bank disagreed. It went forward with the foreclosure, taking title to debtor's property post-petition, and only thereafter consulted with its bankruptcy counsel about the legal effect of the petition. The court declined to award punitive damages, reasoning that the only "misconduct" was the bank's "failure to promptly seek a Court determination of whether, under ambiguous circumstances, its actions violated the automatic stay." *Id.* at 520; *see also Adomah*, 368 B.R. at 139 (upholding denial of punitive award where "[a]t worst, the Bank made a mistake of the law").

For similar reasons, the confusion here regarding the legal effect of the petition on the foreclosure sale provides an independent basis for reversing the punitive award. (*See, e.g.,* Mem. at 32 (noting the Referee's "confusion about the legal effect of the bankruptcy filings.").) The confusion was perpetuated in the first instance by the Referee, who announced that he planned to continue with the sale on a contingent basis. Because the participants in the challenged foreclosure sale were all non-lawyers, the rationale for denying punitive damages is even clearer.

Finally, as discussed *above*, the record makes clear that HSBC and its agents took immediate steps to halt all foreclosure related activity within 48 hours of the auction and after they confirmed the validity of the petition. Contrary to the holding below, courts generally have recognized that

20

these sorts of efforts to remedy what is, at most, a technical violation of the stay immediately after it

occurs are sufficient to negate any inference of malice or bad faith. *See, e.g., Dailey v. Chase Bank*

*USA, N.A.*, No. 07-81073, 2007 Bankr. LEXIS 4323, at *4-5 (Bankr. C.D. Ill. Dec. 18, 2007)

("Every willful violation of the automatic stay does not, *ipso facto*, warrant punitive damages. . . .

When a creditor promptly and effectively addresses the offensive conduct upon notification from the

debtor or the debtor's attorney, punitive damages are generally avoided."); *Calvin v. Wells Fargo*

*Bank, N.A.*, 329 B.R. 589 (Bankr. S.D. Tex. 2005) (upholding decision to deny punitive damages

where, *inter alia*, "the [Creditor] immediately notified the Debtors and the Trustee as to the action

that it had taken and requested direction from the Trustee regarding what to do with the funds");

*Salem*, 260 B.R. at 257 (finding creditor "did not act with malice because it took active steps to stop

[the post-proceeding] once they received formal notice of plaintiff's bankruptcy petition"). The

bankruptcy court clearly erred by ignoring HSBC's post-auction efforts to honor the stay and

focusing instead on its "institutional indifference" (another point directly contradicted by HSBC's

conduct) to justify the award.

  In short, there is simply no support in the record for awarding damages to punish conduct that

at best reflects HSBC's concerted efforts to immediately comply with the automatic stay

requirements and at worst reflects a reasonable mistake of law made in ambiguous circumstances by

non-lawyers. Although the purposes of the Bankruptcy Code "might benefit from a lenient standard

for punishing violations of the automatic stay [that] encourage[es] would-be violators to obtain

declaratory judgments before seeking to vindicate their interests, . . . improving legislation by

amending it is not our function; only Congress can rewrite the statute." *Maritime Asbestosis Legal*

*Clinic v. LTV Steel Co. (In re Chateaugay Corp.)*, 920 F.2d 183, 187 (2d Cir. 1990). The punitive

damages award here is a radical departure from both the text of the Bankruptcy Code and sound

principles of bankruptcy jurisprudence; it should be reversed.

## IV.    THE AMOUNT OF THE PUNITIVE DAMAGES AWARD VIOLATES DUE PROCESS.

Even assuming that punitive award is justified here (it is not), the amount of the award—

$60,000—is unconstitutionally excessive when compared to the actual damages of $66.88, the lack

of harm suffered by the Debtor, the technical nature of any violation of the automatic stay, and the

remedial steps immediately taken by HSBC and its agents to honor the stay after they confirmed the

validity of the petition. The Supreme Court has identified three guideposts for determining whether a

punitive damage award is unconstitutionally excessive. *See BMW of N. Am., Inc. v. Gore*, 517 U.S.

559, 574 (1996). They include (1) reprehensibility of the wrongdoing; (2) the disparity between the

harm suffered by the plaintiff (compensatory damages) and the punitive damage award; and (3) the

difference in the punitive damage awarded here and those imposed in comparable cases. *Id.* at 574-

75. The bankruptcy court ignored *Gore* and its progeny in imposing its punitive damages award.

Suffice to say that those guideposts make clear that a punitive award of $60,000 based on $66.88 in

actual damages for, at most, a technical violation of the Bankruptcy Code, cannot withstand

constitutional scrutiny.

*First*, the degree of "reprehensibility" of HSBC's conduct is minimal.  In *State Farm*, the

Court identified a host of aggravating factors to consider in assessing reprehensibility:  whether the

harm caused was physical as opposed to economic; whether the tortious conduct evinced an

indifference to or a reckless disregard of the health or safety of others; whether the target of the

conduct was financially vulnerable; whether the conduct involved repeated actions or was an isolated

incident; and the harm was the result of intentional malice, trickery, or deceit,  or mere accident.

*State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419, (2003).  There is no dispute that

Debtor suffered no physical harm in connection with the bid; HSBC's conduct did not evidence a

disregard to the health or safety of others; the submission of the bid was an isolated act; and, as discussed, any violation of the automatic stay was "mere accident," and attributable principally to confusion at the foreclosure sale over the legal validity of the petition. Although the Debtor was, almost by definition, "financially vulnerable," that single factor does not weigh in favor of finding HSBC's conduct "reprehensible" for the guidepost analysis. As a legal matter, "the existence of any one . . . factor[] weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect" *Id.* As a practical matter, Debtor suffered only *de minimis* economic harm in the out-of-pocket costs incurred as a result of attending the Show Cause hearings (Mem. at 25); thus, even the Bankruptcy Court effectively found that Debtor ***suffered no actual harm*** in connection with the foreclosure sale itself. As discussed extensively above, the conduct of HSBC and its agents constituted, at most, an unintentional technical violation of the stay. It did not involve the kind of highly reprehensible conduct that is typically addressed through punitive awards. *Cf., In re Taylor*, No. 96-31737, 1997 Bankr. LEXIS 1322 (Bankr. E.D. Cal. June 25, 1997) (holding that intimidation of debtor and repossession of debtor's automobile post-petition constituted a "severe" and reprehensible offense under *Gore*).

***Second***, the disparity between the harm actually suffered by the Debtor and the amount of the punitive award is enormous. As the U.S. Supreme Court recently reiterated, "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *See Exxon Shipping Co. v. Baker*, 128 S.Ct. 2605, 2626 (2008) (citing *Campbell*, 538 U.S. at 425). Although low compensatory damages may sometimes justify a higher ratio in rare cases of exceptional malefaction, "[w]hen the ratio is a breathtaking 500 to 1 . . . the award must surely 'raise a suspicious judicial eyebrow.'" *Gore*, 517 U.S. 559 (vacating and remanding punitive award with 500-to-1 ratio to compensatory damages as "grossly excessive") (citation omitted).

23

There is no question that the amount of the punitive award here -- which represents a 1,000-to-1 ratio

to compensatory damages -- "transcends the constitutional limit" established in the *Gore-Campbell-*

*Exxon* line of cases. The fact that the challenged conduct involves, at most, a technical violation of

the stay that caused only *de minimis* economic injury, and does not involve the kind of highly

"reprehensible" conduct that typically characterize punitive damages awards, *see, id.* at 562, 583,

only underscores the error of imposing significant punitive damages here. *Compare In re Taylor*,

1997 Bankr. LEXIS 1322 at *7  (awarding punitive damages equal to four times actual damages in

case involving intimidation of debtor and post-petition repossession of debtor's vehicle); *In re*

*Kaufman*, 315 B.R. 858, 869-871 (Bankr. N.D. Cal. 2004) (awarding punitive damages between 0.4

and 3.9 times actual damages where creditors physically evicted debtor, moved into her residence

and sold all of her personal property at auction, including clothing and playthings for her five-year-

old child); *In re Quinenes Ocasio*, 272 B.R. 815 (B.A.P. 1st Cir. 2002) (imposing punitive damages

nine times the amount of actual damages where creditor "accosted" and "threatened the Debtor with

physical bodily harm).

    *Finally*, a comparison to analogous cases highlights the $60,000 punitive award imposed

here as an extreme outlier. *Gore*, 517 U.S. at 574.  In far more egregious cases –in which creditors

actually took title to or possession of debtors' property with full knowledge of a pending bankruptcy

petition – courts have imposed far lower actual punitive awards. *See, e.g., In re Hartley*, 75 B.R. 394

(S.D. Ala. 1987) (affirming $2,000 punitive damages based on creditor's acceptance of deed in lieu

of foreclosure during debtor's bankruptcy case); *Davis v. Matt Gay Chevrolet, Inc.*, 374 B.R. 366,

373 (Bankr. S.D. Ga. 2007) (awarding $2,500 in punitive damages based on "incredibly . . . reckless

or arrogant disregard for federal law" in selling debtor's vehicle which secured loan subject to

Chapter 13 petition); *In re Hodge*, 367 B.R. 843, 846 (Bankr. M.D. Ala. 2007) (imposing $1,000

24

punitive damages award on creditor who, after confirming petition with debtor's bankruptcy counsel, telephoned debtor and threatened her with physical harm, arrest and criminal prosecution); *see also In re Lukach*, , 2007 Bankr. LEXIS 1631, at *18 (imposing $5,000 punitive award on $3,700 of actual damages in connection with post-petition collection after receiving notice of petition from debtor's counsel); *In re Campos*, 2006 Bankr. LEXIS 2166 (Bankr. N.D. Cal. Sept. 1, 2006) (awarding punitive damages of $5,000 based on compensatory damages of $10,465 where creditor filed a post-petition complaint against debtor in state court); *In re Ocasio*, 272 B.R. 815 (imposing $9,000 punitive damages award where creditor "accosted" and "threatened the Debtor with physical bodily harm"). While even the amounts awarded in those cases far exceed the constitutional maximum that would be permitted here, they clearly illustrate the error in the grossly inflated awarded imposed in this case.

## CONCLUSION

For the foregoing reasons, HSBC respectfully requests that the punitive damages award be vacated in its entirety. In the alternative, HSBC respectfully requests that the amount of the punitive damages award be vacated and remanded with instructions to restate the award for no more than a single-digit multiplier of actual damages.

Respectfully submitted,

Dated: August 22, 2008

John A. DiCaro, Esq. (JD 7832)
Shapiro & DiCaro, LLP
Attorneys for Appellant
250 Mile Crossing Boulevard, Suite One
Rochester, New York 14624

O'Melveny & Myers LLP
Of Counsel on the Brief for Appellant
1625 Eye Street, NW
Washington, D.C. 20006-4001

25

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
IN RE

JUDITH ANNE CRAWFORD                    Case No. 08 CIV. 6617

                                        Hon. Stephen C. Robinson

                    DEBTOR

---

### AFFIDAVIT OF SERVICE BY MAIL

STATE OF NEW YORK        )
                         )ss:
COUNTY OF MONROE         )

I, Shannon Thompson, being sworn, says, I am not a party to this action; I am over 18

years of age, I reside in Rochester, New York.

On August    , 2008 I served the within Brief of Appellant HSBC Bank USA, as Trustee

for the Registered Holders of ACE Securities Corp., Home Equity Loan Trust Series 2004-INI,

Asset Backed Pass-Through Certificates upon:

TO:    Michael David Pinsky, Esq.
       Attorney for Appellee
       Law Office of Michael D. Pinsky, P.C.
       211 Main Street
       P.O. Box 148
       Goshen, NY 10924

the addresses designated by the foregoing individual for that purpose by depositing a true copy

of same enclosed in a postpaid, properly addressed wrapper, in an official depositary under the

exclusive care and custody of the United States Postal Service within the State of New York.

Shannon Thompson
Legal Assistant

Sworn to before me this

22nd day of August, 2008

Notary Public
Anne E. Hulbert
Qualified in Monroe County
Commissions Expires May 31, 2010